Matthew Christopher **BROWN**,
Plaintiff,

v.

**RAYTHEON AIRCRAFT COMPANY**,
Defendant.

No. 99–1434–WEB.

United States District Court,
D. Kansas.

March 6, 2002.

---

115. See Plaintiffs' Motion For Partial Summary Judgment (Doc. # 523).

Rebecca A. Hesse, Terry L. Mann, Roger E. McClellan, Martin, Pringle, Oliver, Wallace & Spikes, L.L.P., Wichita, KS, for Defendant.

Jim Lawing, Wichita, KS, for plaintiff.

## Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

Plaintiff Matthew Brown is a pilot who was hired by defendant Raytheon Aircraft Company ("Raytheon") on August 24, 1998. Raytheon terminated his employment about a year later, on August 30, 1999. Plaintiff subsequently filed this action under 42 U.S.C. § 1981 claiming he had been discriminated against on account of race. The matter is now before the court on Raytheon's motion for summary judgment. The court finds that oral argument would not assist in deciding the issues presented.

### I. Uncontroverted Facts.

■ In keeping with the standards governing summary judgment, any facts in the parties' briefs not properly supported by the record have not been included in the following statement. As the defendant points out, plaintiff's response frequently fails to make clear which of the defendant's factual averments are controverted. In accordance with D.Kan.R. 56.1, where plaintiff has failed to specifically controvert facts, those facts have been deemed admitted for purposes of summary judgment. Any matters as to which the record discloses a genuine dispute of fact have been construed in the plaintiff's favor for purposes of determining whether the defendant is entitled to judgment as a matter of law.

Defendant Raytheon is a manufacturer of aircraft for general aviation and military use. Plaintiff Matthew Brown is an African–American male who became employed by Raytheon as a pilot on August 24, 1998. Plaintiff's resume came to Raytheon initially through an organization named the Black Pilots of America. Raytheon was aware at the time it hired plaintiff that he was African–American.

Plaintiff received an offer of employment in a letter from Raytheon on August 5, 1998. The letter included a statement that "any oral statements which may have been made to you during your interview(s) and discussions are valid only to the extent to which they conform to the terms of this letter and its attachments." Plaintiff accepted his job offer on that basis, and was subsequently informed of that status again in the Raytheon orientation. Throughout his employment, plaintiff was an employee at will. At the time of his new employee orientation, plaintiff was given a copy of Raytheon's Rules of Conduct.

When plaintiff was hired by Raytheon, he was first assigned to Department 857 (Jet Demonstration). The basic mission of this department was to demonstrate Raytheon jet aircraft to prospective customers and their pilots. Plaintiff had no prior experience piloting jets; his experience was limited to propeller aircraft. Plaintiff was initially given the assignment of piloting Raytheon propeller aircraft carrying company employees to various destinations. This transportation duty came under the responsibility of the Administration department, which was headed by Duane Starr. Mahlone Becker's notes indicate this assignment was made to give plaintiff flight time because of a lack of time as "PIC" (Pilot In Command) and jet time.

Raytheon pilot Mark Loyacano testified that at the time in question, corporate transportation functions were being merged under the responsibility of Mahlone Becker, and there was some confusion of roles due to the fact that there was a jet demonstration department and a separate turboprop demonstration department. Loyacano testified that "all the pilots were shared in all the groups, as well as over in other areas of the company. We all intermingled in our jobs."

Plaintiff initially earned $52,500 per year. According to the terms of his offer of employment, increases in plaintiff's base pay were contingent upon successful achievement of Demonstration Captain status. If plaintiff received Captain status on propeller aircraft, he would receive a $2,500 increase in his annual base salary. If he achieved Demonstration Captain status on the Beechjet, he would receive an additional $2,500 increase in his annual base salary. Plaintiff was informed in Raytheon's letter of August 5 that achieving Demonstration Captain status was dependent upon the availability of aircraft and plaintiff's personal abilities.

When plaintiff was hired by Raytheon, Mahlone Becker, the Chief Pilot in charge of the Jet Demonstration department, indicated to him that he would be given an opportunity to attend Flight Safety jet training for the Beechjet and to obtain a type rating on that jet. There was an understanding in the company that pilots assigned to Jet Demonstration (including plaintiff) were supposed to be on track for jet training and eventual demonstration captain status on jet aircraft, provided they demonstrated the ability and such aircraft were available. See Def. Exh. 2 at 186.

Plaintiff does not contend there was anything racially discriminatory about Raytheon's hiring process. The hiring process included an interview with Mahlone Becker. Although Becker was instrumental in getting plaintiff hired, plaintiff claims Becker later discriminated against him based on race.

Plaintiff contends that the following were the racially discriminatory actions he encountered while working at Raytheon:

racial comments made in his presence; being retaliated against for filing a charge with the EEOC and complaining of race discrimination to upper management; being required to fly propeller planes, and not being given training opportunities for flying jet aircraft; and being terminated from employment.

Work Schedule and Pay.[1]

When plaintiff was assigned to the Jet Demonstration department, he was initially scheduled to work ten days on and five days off. Mahlone Becker later changed plaintiff's schedule to five days on and two days off. Other Raytheon pilots, including Mark Moon, John Bair, Gary Blessing, Jack McFarlane, Trevor Blackmer, and Duane Starr, all of whom are Caucasian, worked the same schedule as plaintiff— five days on, two days off. Duane Starr was the Chief Pilot for the Transportation Group. John Bair mentioned on more than one occasion that he would prefer a different schedule, but his schedule was not altered.

In November of 1998, plaintiff was sent to Flight Safety and received a type rating on the Beech 1900, a twin-engine turbo-prop manufactured by the defendant that carries up to 19 passengers. Plaintiff had prior experience as a co-pilot on the 1900.

Plaintiff achieved Captain status on the 1900 on or about March 22, 1999. Plaintiff was supposed to receive a $2,500 increase in his annual base salary at that time, although he did not actually receive the raise until June 3, 1999. According to Raytheon, this was due to an inadvertent oversight which affected plaintiff and other employees. Plaintiff and the other employees were given retroactive checks to

---

1. The court understands from plaintiff's response (and from the Pretrial Order) that the ensuing discussions of plaintiff's work schedule, hours, and parking pass are not asserted as the basis of a § 1981 violation. Rather, plaintiff contends they are relevant to show defendant's discriminatory intent with respect to his claims of unlawful retaliation, failure to train and termination.

cover all of the compensation they should have received had the payroll change been completed in a timely fashion. Pilot Todd Ringelstein, who is Caucasian, also received a retroactive check for a payroll change that had been missed.

Parking Pass.

Plaintiff contends he did not receive a parking pass to park at the Raytheon area of Mid–Continent Airport due to his race.

Parking passes are not permanently assigned. Plaintiff is aware of several Caucasian pilots who did not receive a permanent parking pass. There was never an occasion where plaintiff had to pay for parking at Mid–Continent Airport while on company time.

Derogatory Comments.

Plaintiff contends he heard racially derogatory comments by certain Raytheon employees, although none of the comments were directed towards him. Plaintiff claims that on one occasion he heard John Bair make what plaintiff considered to be a derogatory comment while Bair was talking on the phone. Bair was talking to some unidentified person and did not know plaintiff was nearby. Plaintiff heard Bair trying to explain to the other person who he had flown with that day, and when the other party apparently did not recognize plaintiff's name Bair said, "You know, the tall black guy." Plaintiff took offense to the fact that Bair described him in terms of race. Plaintiff also contends that on another occasion Bair laughingly referred to plaintiff and himself as "a tall black guy and a short white guy." Plaintiff concedes that these comments did not affect his work.

Plaintiff contends that on another occasion a non-supervisory employee made a comment, which plaintiff is unable to recall, about Asians. Plaintiff admits he did not hear any comments that he considered extremely derogatory during his tenure with Raytheon.

Retaliation Claims.

Plaintiff contends he was retaliated against because he called Art Wegner's office to make a complaint regarding racial discrimination. At the time, Wegner was the President of the company. Plaintiff did not speak to Wegner, but had a conversation with his secretary.

Plaintiff believes that his jet flight training was canceled for making the above complaint. According to plaintiff, he called Wegner's office a few days after meeting with John Thomas and Roy Schoenherr on June 1, 1999. According to the testimony of John Thomas, Thomas made the decision to postpone plaintiff's training before the meeting with plaintiff on June 1, 1999, because he wanted to further evaluate plaintiff's flying abilities on propeller aircraft before moving him to jet aircraft.

Abilities, Transfer and Training.

Plaintiff contends he was limited to flying propeller planes because of his race.

Plaintiff flew propeller-driven aircraft with Mark Moon at least fifteen or more times and with John Bair around fifteen times. Plaintiff also flew propeller-driven aircraft with Duane Starr and Gary Blessing.

Blessing did some one-on-one sessions with plaintiff regarding takeoffs and landings. According to Blessing, plaintiff initially incurred some minor difficulties but responded to his suggestions. Blessing reported to Duane Starr that plaintiff "was [a] normal, pretty average pilot, not great, but not a big problem either."

In December of 1998, Mahlone Becker sent a memo to John Thomas regarding plaintiff's annual review. The memo said plaintiff was doing acceptable work and progressing well in both flight skills and overall company knowledge, but that Becker had chosen not to evaluate him due to his recent hire date. Becker said plain-

tiff's evaluation would be done in February of 1999.

Plaintiff received a notice from Raytheon in February of 1999 indicating that he was scheduled for Flight Safety training on the Beechjet in June of 1999. On April 22, 1999, Mahlone Becker wrote up a special 9–month performance review for plaintiff. The review was positive and graded plaintiff as above average in quality and quantity of work, and excellent in initiative and attitude. Under the "goals" section of plaintiff's review, Becker indicated a goal of obtaining Beechjet type rating and Senior Demonstration Captain status on the Beech 1900 by December of 1999, and Beechjet Captain status in the first quarter of 2000.

John Bair was Safety Officer for Raytheon in 1998 and 1999. Bair testified that on his flights with plaintiff, he noted several problems with plaintiff's ability to control the airplane. He said plaintiff became nervous when at the controls, that he sweated profusely and made constant adjustments to the flight controls and power levers, and that he sometimes had trouble maintaining altitude and heading. Plaintiff denies that he had any such trouble. As the Safety Officer, it was Bair's responsibility to report any safety issues to John Thomas, the Director of Flight Management.

Mark Loyacano, who flew propeller-driven aircraft with plaintiff on several occasions, testified that plaintiff did not seem to recognize when he needed to make certain corrections for the control of the aircraft, particularly in landing the plane. He testified that he and plaintiff discussed some landing techniques, especially with regard to crosswind landings. Loyacano testified that plaintiff was receptive to these suggestions. Loyacano testified that plaintiff did some training on crosswind landings and that he performed satisfactorily during the training. He tes-

tified that plaintiff had a recurring problem with crosswind landings, however, and that on one flight after the training, plaintiff was not making the corrections that he needed to make on a crosswind landing, so Loyacano told him precisely what to do. Loyacano later discussed his concerns with Mahlone Becker and with Stan Gunning.

Duane Starr, Gary Blessing, Trevor Blackmer, Mark Moon and John Bair discussed whether plaintiff was having problems. Blessing believed that plaintiff had no more deficiencies than were normal for a new pilot. John Bair, Mark Moon and Duane Starr reported to John Thomas, the Director of Flight Operations, that plaintiff was having difficulty with some basic flying skills. Bair also reported his views to Roy Schoenherr, the Deputy Director of Flight Management. Schoenherr testified that he saw reports of Starr, who was an experienced pilot, indicating that plaintiff had trouble maintaining air speed and a stabilized approach, which in Schoenherr's opinion raised a concern with regard to consistent, safe landings.

Among other things, Bair complained about a flight on May 4, 1999, that he flew with plaintiff to Houston Hobby International Airport. Plaintiff was the PIC, or Pilot In Command, on this flight. Bair said that plaintiff slowed down to landing speed while still approximately one hundred miles out from the airport, which caused congestion in the air traffic. Bair told him that he needed to speed up. Plaintiff did not increase his speed. Then, according to Bair, while shooting the approach to the airport plaintiff was unable to follow the glide slope, the track a pilot is required to take to reach the airport. Bair said he had to help plaintiff by lowering the gear, pushing the props forward, and dropping the flaps to get the aircraft in a configuration so they could land. There were strong crosswinds, which Bair said caused

plaintiff to have further problems landing the aircraft. Bair claimed that plaintiff landed on the runway out of control, with the aircraft bouncing all across the runway and almost into the grass before plaintiff was able to gain control.

According to plaintiff, he had been given an airspeed to maintain by the air traffic controller, and in keeping with FAA regulations he maintained that air speed. Plaintiff testified that he so informed Bair during the flight and told him this was the speed they would maintain. He testified that Bair was apparently upset by this and became quiet and withdrawn. Plaintiff denies that he had any dangerous landings of the type alleged by Bair.

Plaintiff was involved in an incident at Raytheon which involved a Starship aircraft going off the runway. According to plaintiff, the brakes failed as he and Mark Moon were taxiing to the end of the runway for a takeoff. Plaintiff determined that under the circumstances the best course was to keep the aircraft going straight rather than attempting a turn and risking a collapse of the landing gear and the possibility of a propeller blade hitting the ground and causing injury. After an investigation, he was commended by Mahlone Becker for his handling of this incident. The brakes on this particular aircraft were later found to be defective.

Mahlone Becker voiced concerns to Nita Long of Raytheon's Human Resources Department and sought guidance on how to handle complaints she had received about plaintiff from other pilots. Long suggested to Becker that she write a chronology of the situation.

Mahlone Becker Notes and Memo.

Plaintiff has submitted what appear to be hand-written notes of Mahlone Becker written on or about May 20, 1999, reviewing plaintiff's situation. Pl. Exh. 15.[2] In the notes, Ms. Becker stated that plaintiff had been hired to be groomed for a Jet Demonstration position, but due to a lack of PIC and jet time he was placed in the transportation operation to build flight time in a less demanding environment. He was sent to Flight Safety training and received a type rating on the Beech 1900 turboprop in November of 1998. Becker said nothing in the Flight Safety records indicated any flying or judgment deficiencies.

Becker's notes recount some complaints she received about plaintiff's flying abilities from Mark Moon and John Bair. Moon expressed several examples of what he believed were judgment problems by plaintiff, including the incident where the brakes failed and plaintiff steered the aircraft straight instead of turning. Moon said he thought plaintiff could have turned without departing the runway. As indicated previously, Becker thought plaintiff handled the situation appropriately. Becker also recounted that she received a phone call from John Bair in which he expressed concern over instances that he thought showed a lack of judgment. For example, Bair stated that on one approach plaintiff waited so long to descend that Bair had to pull his power back for him. According to her notes, Becker told Bair that coming in high was not a safety issue and that it only created the potential for an embarrassing "go around," which Becker said would have been a good teaching tool. When Bair expressed concern over losing his own job over such incidents, Becker said that was not the case, and she told him that by jumping in he had prevented plaintiff from learning from his

---

**2.** Plaintiff has not cited evidence to establish a foundation for Exhibit 15, but the court will assume for purposes of summary judgment that he could establish the appropriate foundation for its admission. See e.g., Fed. R.Evid. 803(6) & 807.

mistake and exercising his command authority.

Becker's notes reflect her view that Moon and Bair were junior pilots and that some of the perceived problems were due to their lack of experience, and she noted she had discussed with Gary Blessing, who was more experienced, a program whereby plaintiff would be paired with Blessing and Duane Starr and they would give plaintiff additional training and evaluation. Becker stated that she would counsel plaintiff and would set up a plan to evaluate his ability to upgrade to Captain status. According to Becker's notes, Starr and Blessing and two other senior pilots, Errol Wuertz and Mark Loyacano, all flew with plaintiff and reported that he did well during training.

Becker's notes state that she met with the plaintiff and informed him other crew members were lacking confidence in his abilities, and she told him she believed it was because he was not exercising his command authority and was trying to get along with them. She told him she needed him to be a captain "ASAP" and was sending him for training and evaluation to determine how close to captain status he was. Becker wrote that after this training was provided, Bair commented that plaintiff had improved significantly. Plaintiff was upgraded to Captain status on March 23, 1999.

According to Becker's notes, she reviewed plaintiff's performance on April 27, 1999. She gave him a favorable review. A few weeks later she met with John Thomas. Thomas told her he and the Safety Official, John Bair, had discussed plaintiff's performance and, as a result, Thomas had instructed Duane Starr to remove plaintiff from PIC status.[3] Becker said she knew nothing of this until after the fact and told Thomas this was not the

way to handle it. She expressed her view that they should not take "a couple of unsubstantiated stories from a junior pilot" at face value. She noted that fortunately Starr had not officially removed plaintiff from PIC status, he had simply instructed dispatch to put someone else in charge until the matter was resolved. At some later point, according to the notes, Bair called dispatch and said he did not want to be paired with plaintiff because he "did not want to be the only one pointing the finger." On May 10, 1999, according to the notes, Bair called a meeting with Starr and Becker and discussed several occurrences that Bair believed showed a lack of skill or judgment on plaintiff's part. According to Becker's notes, Bair said that plaintiff would pass an FAA check but was not flying up to Raytheon's standards.

According to Becker's notes, additional conversations with Gary Blessing revealed that he did not believe there was an issue. The notes also express Becker's concern that John Bair was not a flight instructor and was not trained to evaluate, that he was inexperienced, that his background was limited to the military and commuter airlines, and that evaluations from senior pilots showed questions about his own flying skills. The notes continued:

> I don't believe John bears any ill will against Matt but that his view is colored by perhaps his own lack of experience & qualification [ & lack of self-confidence], such that he's afraid for his own job. My decision at this point is to pull Matt from flying w/ John Bair and Mark Moon & place him w/ Production [Test] & TP Demo so more senior people have an opportunity to evaluate. I can not discount the possibility that a problem exists. However I believe that a 60 day time frame in production will reveal any

---

**3.** An organizational chart submitted as Plaintiff's Exhibit 4A indicates that as the Safety Official Bair reported to John Thomas rather than to Mahlone Becker.

real issues under the guidance of senior pilots as well as giving Matt an increase in flight time.

The notes concluded by saying there had been some confusion over company policy as to the PIC [Pilot in Command] on a given trip, and said this misunderstanding led to many of the problems plaintiff, Moon and Bair were experiencing in the cockpit.[4]

Assignment to Production Flight Testing.

On May 21, 1999, Becker addressed a memo to John Thomas as a follow up to two issues they had discussed on the phone a few days before: the "team lead issue" and the "Matt Brown issue." As to the team lead issue, the memo indicated there had been confusion among Duane Starr, Mark Moon and John Bair on this subject and that it was being addressed. As to the "Matt Brown Issue," Becker's memo stated:

1. I'm not taking Matt Brown off PIC status. Matt is a new captain and crew pairings are still being overseen by Duane Starr and myself.

2. I spoke with Nita Long and relayed the situation. She believes that our handling of the situation is fine and that I should put together a chronology. This I have completed. She does not believe that anything further should be said to Matt but that the idea of separating him from John Bair and Mark Moon by placing him in production test is a good plan. Flying with some other senior people will fulfill the need for additional evaluation by more experienced pilots and increase Matt's overall flight time and exposure to varied flight environments.

3. John Bair said Matt would be able to pass a FAA checkride but just didn't think he was up to our standard.

4. John Bair's misunderstanding of the team lead concept is part of the confusion with Matt's situation. John even commented that he realized he was unfounded in commanding Matt to maintain a certain speed (just because John wanted him to) based on his new understanding of the team lead concept.

5. Either Duane Starr, Roy Schoenherr or myself will be meeting with Matt to discuss his next area of assignment at the first part of next week.

6. While I may delay Matt's Beechjet school during a sixty day loan to Production Flight, I am planning on sending him to Beechjet school. This is assuming nothing of concern reveals itself.

There has been a lot of brain work put into these two issues. I've tried to hit the high points for you so you're in the loop but currently your team is handling both situations so don't worry.

Pl. Exh. 9.

Plaintiff testified that toward the end of May 1999, he had phone calls or conversa-

---

4. Becker's notes state that "a discrepancy had arisen w/a concept used in our operation related to who the PIC is on any given leg. John Bair, Mark Moon & Duane Starr believe that the PIC for a trip is responsible no matter what[.] [A]s a result several of the stories that Bair and Moon related are due to their misunderstanding of the policy. [At this point in the notes, the additional comment "due to their military background" is stricken out.]

As the court understands it, Becker believed Bair and Moon were operating under a military concept under which the pilot who was the "team lead" was ultimately responsible for the aircraft, whereas in the Raytheon operation the PIC on a particular leg of a flight was responsible. See Def. Exh. 2 at 426–27. Because the Raytheon pilots frequently alternated positions as PIC and Second in Command, the team lead would not necessarily be the PIC on a given flight. Becker's notes indicate that she thought Moon and Bair were operating under the assumption that they were ultimately responsible on some flights even though they might be second in command on those flights.

tions with Mahlone Becker during which she discussed the perceived problems involving John Bair and Mark Moon and told plaintiff she was planning on assigning him to work with Roy Schoenherr's group. Plaintiff said he thought there were other ways of dealing with the problem, and at some point he expressed the view that his treatment was due to race. Plaintiff testified that Becker said she would think about his assignment but added in a later conversation something to the effect of "her hands were tied." Plaintiff testified that within a week or so of these conversations Becker took maternity leave. Plaintiff testified that he spoke to Becker shortly thereafter and that Becker said she had turned the matter over to John Thomas.

John Thomas testified that Ms. Becker could nominate a pilot for jet training but that he (Thomas), as her superior, could veto the selection. Thomas testified that he canceled the jet flight training that was previously scheduled for plaintiff because of his concerns over plaintiff's performance as a pilot. In Thomas's opinion, managing energy and lift control is more difficult in a swept-wing jet aircraft, and if a pilot is having trouble controlling speed, approach path, or altitude in a propeller aircraft, such problems would be compounded in a jet. Plaintiff disagrees with that assessment; he testified that flying a jet is easier than flying a propeller aircraft.[5]

Plaintiff testified that during his June 1, 1999, meeting with John Thomas and Roy Schoenherr, Thomas told plaintiff there had been complaints about his performance, and he mentioned John Bair by name. Thomas discussed the fact that he wanted further evaluation of plaintiff's abilities, and told plaintiff he was being assigned to Schoenherr's group to start flying aircraft in the Production Flight Test group. Plaintiff told Thomas he

thought he was being highly scrutinized and did not want this assignment. According to plaintiff, Thomas told him there was no other option, and said that if plaintiff did what Thomas wanted he could "end up being on the fourth floor of this company," which plaintiff took to mean in the executive suite. Thomas told plaintiff he did not know what would become of plaintiff's Beechjet training. Plaintiff testified that he asked Thomas if he would still be attending the Beechjet training session scheduled for June, but plaintiff cannot recall whether Thomas said he would or would not be going to that session. Plaintiff asked if the assignment to Production Flight Testing would give him an opportunity to fly jets; Thomas said it would not. Thomas told plaintiff that the length of this assignment was yet to be determined. Roy Schoenherr tried to persuade plaintiff that this was a good opportunity to expand his flying experience and told plaintiff the pilots he would be flying with would not be briefed to look for his mistakes. He told plaintiff he would be helping out the production flight test department because they were short-handed. Schoenherr viewed it as a "win-win" situation, because if plaintiff was not up to par they could offer him any training he needed, and if he performed well it would put to rest any question of his not being able to fly properly.

Thomas testified that at the time of the June meeting, he and Schoenherr were not completely convinced that plaintiff had any significant performance problems, but because safety was their foremost concern and responsibility they believed there was a need for further evaluation. Thomas said they elected to assign plaintiff to temporary duties in production flight because it would enhance plaintiff's knowledge of

---

**5.** Plaintiff cites no evidence that Thomas's belief was not genuinely held or that it was so far outside the norm as to raise questions about its credibility.

other aircraft, it would assist the production flight department, and it would put plaintiff in an environment where he could be objectively evaluated by other qualified pilots. Thomas testified that if the evaluation revealed areas of deficiency they would provide additional training to plaintiff, and in the event no deficiencies were revealed they would investigate the abilities of the individuals who reported the problems and see if they were the ones who needed additional training.

Roy Schoenherr testified that at the end of the June 1 meeting, plaintiff said that he had some things to think about and that he would let them know. Plaintiff left the meeting with the understanding that he was being given a couple of days off to decide whether or not he wanted to take the assignment.

Plaintiff testified that certain Caucasian pilots hired after him received jet training before he did and that he was the only pilot under Mahlone Becker's supervision who was not allowed to attend any type of jet training. Plaintiff contends the cancellation of the jet training was due to his race, asserting that Caucasian pilots received jet training shortly after coming into the Jet Demonstration department. He states that Kliewer, Blackmer and Ringelstein achieved Demonstration Captain status on May 10, 1999. By contrast, plaintiff was not given an assignment to jet flight training until he was notified in February 1999 that he would receive the training in June 1999, and the training was subsequently canceled by John Thomas.

The three Caucasian pilots hired after plaintiff who received jet training before him were Trevor Blackmer, Todd Ringelstein and John Kliewer. These three individuals were all type rated in jets and already had experience as jet pilots at the time of their hire with Raytheon. Plaintiff was not type rated in jets and did not have any hours flying jets when he worked at Raytheon.

The pilots at Raytheon are not on any kind of seniority rank system in terms of determining when someone is trained.

Plaintiff testified it was common practice if a pilot had a problem with another pilot's performance to discuss it amongst themselves. He testified that Mark Moon and John Bair did not discuss with him the alleged deficiencies they reported to John Thomas. Plaintiff conceded that John Bair's role as a safety official would obligate him to report any safety issues to his supervisor, John Thomas. Plaintiff believes that if John Thomas had done more investigation of these complaints he would have discovered they had no substance to them.

Some pilots considered an assignment to Production Flight Testing to be a desirable assignment. Pilots in that department gain technical knowledge and expertise and have far less travel in their daily routine.

There have been Caucasian pilots who have been assigned to Production Flight Test to give the pilot an opportunity to fly different aircraft and to allow the company to get a better feel for how the pilot is flying and to determine whether there were any issues that need to be addressed.

Thomas has recruited African–American pilots in the past and was responsible for hiring Johnny Hobbs, an African–American who is Raytheon's Chief Pilot for Safety, and whose performance Thomas rates as outstanding.

The temporary transfer to Production Flight Test would not have caused plaintiff to suffer a demotion or a reduction in pay, but it would have put off plaintiff's jet training and the opportunity for a promotion to captain status flying jets, which is what plaintiff wanted and is what Mah-

lone Becker told him he would have the opportunity to do when she hired him.

Plaintiff contends that the Production Flight Test department was a "hostile work environment." However, plaintiff never worked there. He expressed concern to Roy Schoenherr that flying in that department would be dangerous. Plaintiff was assured that no Production Flight Test pilot had ever been injured, and that he would always be flying with the senior test pilots in the department.

Plaintiff never went to work for the Production Flight Test department. He did not report for work again from June 1, 1999, through the date of his termination, August 30, 1999.

Plaintiff's Termination.

Raytheon's Rule of Conduct No. 1 prohibits being absent from work for three consecutive working days without proper notification. The rule states that a violation will result in immediate termination. Rule No. 13 prohibits repeated absence or tardiness from work without reasonable cause. Rule No. 46 prohibits threatening behavior, as does the company's Workplace Violence policy. The rule states that threatening, intimidating, coercing or interfering with supervision will result in termination.

After the June 1 meeting, plaintiff had several phone conversations with Roy Schoenherr. Schoenherr said that his department needed help and he tried to talk plaintiff into coming to work there. Plaintiff said he felt he was being discriminated against and indicated he did not want to work in Production Flight Testing because he thought it was a "hostile work environment." [6] Schoenherr told plaintiff they needed his help.

Nita Long talked with plaintiff on the phone. Long testified that plaintiff said he was just going to call in sick. Plaintiff testified that he did not recall that conversation but said "that could have happened." He does recall Long saying there was another way to handle this and that he needed to be a professional and go work with Roy Schoenherr.

Plaintiff called in to Schoenherr's office around June 7, 1999 to report that he would be sick all week. On June 14, 1999, he again called in and left a message that he would be sick all week. Roy Schoenherr called plaintiff and asked if he was under a doctor's care. Plaintiff said yes. Schoenherr said he did not really need to know the nature of the illness, but reminded him that he needed a medical authorization before he could return to work. Schoenherr said that "when you are feeling better, we need you healthy prior to coming back," and "[w]hen you do come back, take your medical documents to the aid station and there is a form that you need to bring over here before we let you start flying." Schoenherr told plaintiff that he needed to call in each day if he was sick. Plaintiff frequently called in sick after that.

Plaintiff sought medical treatment on or around June 9, 1999, complaining of stress, headaches and insomnia. The doctor offered him a sample pack of Prozac to try, but plaintiff testified that he never took the samples.

Schoenherr testified that he talked to Nita Long in Human Resources on several occasions about plaintiff's situation, and that she recommended Schoenherr try to convince plaintiff to come back into work.

---

**6.** In his deposition, plaintiff explained that he believed this assignment would be a "hostile work environment" because on one occasion he had been with pilots from that department when one of them told some racial jokes and the others were laughing, and because plaintiff believed that testing airplanes would be a risky job.

On several occasions, plaintiff left messages on Roy Schoenherr's voice mail saying he would not be in. Some of the messages were left at around two or three o'clock in the morning. Schoenherr testified that some of the messages were difficult to understand and became more and more illogical.

Plaintiff filed a complaint with the Kansas Human Rights Commission on June 25, 1999, alleging that he was being discriminated against due to his race and his age (at the time plaintiff was 40 years old).

Plaintiff sought medical treatment on or about July 1, 1999, for a fungal toenail infection that was causing his toenail to start coming off. The doctor prescribed an anti-fungal cream, and a follow up exam on July 26, 1999, indicated the condition was much improved.

Plaintiff concedes that he was physically and mentally able to work at all times after June 1, 1999.

Plaintiff continued to be paid by Raytheon for the period June 1 to August 30, 1999, although he failed to report for work.

Raytheon's rules state that the first offense of refusal or failure to do a job assignment is time off up to five working days, although the rules also state that Raytheon may assess either more severe or less severe penalties depending on the seriousness of the infraction. Raytheon has terminated Caucasian employees for failing to do the job they were assigned.

On or about August 28, 1999, there was a Raytheon pilots' meeting in a conference room at Tallgrass Country Club in Wichita. Plaintiff was aware that Raytheon periodically held such meetings, and he was aware that Raytheon was having this particular meeting on the 28th. Plaintiff testified that he went to Tallgrass Country Club on August 28th to get a sandwich and to look at some golf clothes, and that he saw what appeared to be an aviation lecture going on in a conference room so he stepped in the room. Plaintiff saw Gary Blessing and was not sure if he should stay or leave. Plaintiff testified that he decided to stay and sat next to or slightly behind Gary Blessing. Plaintiff had not been seen by the Raytheon pilots for nearly three months. Plaintiff took a chair from the back of the room and placed it in the center of the aisle separating two rows of pilots who were listening to the presentation. Bair turned around and saw plaintiff and nodded his head at plaintiff. Plaintiff did not acknowledge Bair. Plaintiff sat and watched the presentation for approximately thirty minutes. When the meeting broke for lunch, Gary Blessing said hello to plaintiff. Plaintiff did not respond. John Bair walked by plaintiff and said hello and asked how he was doing.[7] Plaintiff responded with something to the effect of, "How do you think I'm doing?" Plaintiff approached John Thomas, who was standing in a buffet line. Thomas said, "Hello, Matt." Plaintiff did not respond, but just looked at Thomas, and then left the room.

Thomas testified that a number of people at the meeting were concerned. He

---

7. The record contains somewhat differing accounts of the incident on August 28th. Bair testified that plaintiff aggressively came up close to him with his fists clenched as though he was going to hit Bair. Bair also testified that plaintiff approached Mark Moon and John Thomas and got very close to them with his fists clenched and did not respond when they asked him how he was or what he wanted. Plaintiff does not deny that he refused to respond to Moon and Thomas, but denied clenching his fists and said he was standing "in normal—closer than handshaking distance," but "not within six inches of each other." When asked whether he exhibited a threatening demeanor towards these individuals, plaintiff responded, "If I did, I'm not sure what is a threatening demeanor or appearance to someone else. I can't see through their eyes at all." Def. Exh. 2 at 360.

said that he was scared because of the expression on plaintiff's face and his mannerisms. Bair, who had previously heard plaintiff talk about his extensive collection of firearms, testified that he was fearful he was going to be attacked. Thomas or one of the other individuals called Raytheon security and asked them to call the police.

John Thomas and Nita Long terminated plaintiff's employment on August 30, 1999. The letter stated that the reasons for termination included "insubordination—failure to report to your temporary assignment in Production Flight, and violation of Rule of Conduct 46—threatening behavior."

On September 10, 1999, plaintiff filed a second KHRC complaint, alleging that he was being discriminated against because he was perceived as disabled, and due to his race and age. Plaintiff also alleged unlawful retaliation. Plaintiff has since dropped his claims of age and disability discrimination.

Part of Nita Long's responsibilities included working with the Kansas Human Rights Commission when complaints of discrimination were filed. After plaintiff's KHRC complaint was filed, Long took notes when a KHRC investigator interviewed Mahlone Becker about plaintiff's complaint. No evidence is cited as to when this interview took place. Long's notes include the following comments:

Mark [Moon] and John [Bair] are both military. John is still Helicopter Col.—Army

Mark was Air Force—

Negative experiences [with] blacks

Got preferential treatment—

Allowed to fly when not qual.

Worked around them so they didn't kill anyone.

This is all over the military.

He believes—

They are expecting that behavior—

Self preservation issue.

Over sensitive about his competence.[8]

## II. Summary Judgment Standards.

The standards and procedures for summary judgment are well established and will not be fully repeated here. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.* A disputed fact is "material" if it might affect the outcome of the suit under the governing law, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Where a plaintiff relies on circumstantial evidence to support a claim of intentional discrimination, courts typically analyze the claim under the burden-shifting test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that test, the plaintiff first has the burden of presenting evidence of a prima facie case showing that an "adverse employment action occurred 'under circumstances which

---

8. The context of this passage is unclear. It appears to reflect Mahlone Becker's understanding of either Bair or Moon's attitude towards plaintiff, but it could also reflect Becker's impression of plaintiff's attitude towards Bair and Moon. No evidence is cited to establish when such views were expressed or to whom the "he" and "they" in the last part of the passage refer. Becker's deposition was not taken in this case. She no longer works for Raytheon (although she is married to a Raytheon employee) and she lives in Europe.

give rise to an inference of unlawful discrimination.'" *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1227 (10th Cir.2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). If a prima facie case is established, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action...." *Perry v. Woodward,* 199 F.3d 1126, 1135 (10th Cir.1999). If the defendant does so, the plaintiff can avoid summary judgment "only if [he] is able to show that a genuine dispute of material fact exists as to whether the defendant's articulated reason was pretextual." *Id.* To establish pretext, a plaintiff must show either that "a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. *See also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "A plaintiff may accomplish this by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997) (quotation and citation omitted).

## III. Discussion.

Plaintiff's claim is premised upon 42 U.S.C. § 1981, which provides in part that "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, ..." Under this section, the term "make and enforce contracts" in-

cludes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. § 1981(b). Plaintiff contends that on account of his race he was denied the opportunity for jet flight training and a promotion to Demonstration Captain flying jets and was terminated. Doc. 53 at 7–8.

In its motion for summary judgment, Raytheon argues the evidence is insufficient as a matter of law to support plaintiff's claim. It first contends plaintiff has failed to cite any evidence that he was harassed on the basis of race during his employment. It further argues plaintiff has not raised any genuine issue as to whether Raytheon denied him jet training on the basis of race, because Raytheon had legitimate non-discriminatory concerns about plaintiff's performance as a pilot, and because the Caucasian employees who were hired after plaintiff but who received jet training before him had better qualifications for flying jet aircraft. Finally, Raytheon argues that the circumstances surrounding plaintiff's discharge present no genuine issue for trial because plaintiff has failed to cite any evidence that Raytheon's purported reasons for discharging him were pretextual.

## A. Racial Harassment.

Raytheon's first argument is that the evidence will not support a § 1981 claim under a theory of racial harassment. Although plaintiff's deposition testimony made some references to his belief that an assignment to Production Test Flight was a "hostile work environment," plaintiff does not appear to be relying on a theory of harassment, inasmuch as his response brief does not mention it. At any rate, the evidence cited by plaintiff about one or two co-workers telling occasional jokes with racial overtones does not qualify as the type

of pervasive harassment that could support a discrimination claim. *Cf. Witt v. Roadway Express,* 136 F.3d 1424, 1432 (10th Cir.1998).

### B. Failure to Train or Promote.

 Plaintiff's main claim is that he was denied jet training on the basis of race and that this in turn prevented his promotion to Demonstration Captain on jet aircraft. Plaintiff's evidence that Caucasian pilots in the same department were hired after him were provided jet training before him is sufficient to establish a prima facie case of discrimination. The defendant has cited evidence of race-neutral reasons for this differing treatment—specifically, Raytheon has cited testimony that John Thomas decided to postpone plaintiff's scheduled jet training due to concerns over complaints from other pilots about plaintiff's performance, and further that the Caucasian pilots hired after plaintiff who received jet training before him had all been previously type-rated in jets and had experience flying jet aircraft. The issue here is whether plaintiff has cited evidence upon which a reasonable jury could find that Raytheon's explanation is a pretext.

There is no dispute that Mahlone Becker and John Thomas each received reports from other pilots questioning plaintiff's mastery of certain flying skills in propeller aircraft. The questions were raised primarily by John Bair and Mark Moon, the two pilots with whom plaintiff flew most frequently. The record suggests that Becker and Thomas talked about how to handle the situation and discussed a plan of temporarily assigning plaintiff to Production Flight Test to determine whether or not there was a problem. Although Becker was clearly skeptical of the reliability of Bair and Moon's reports, she noted she could not discount the possibility of a problem and agreed that further evaluation of plaintiff's abilities was needed. She

thus endorsed the temporary assignment, which would have resulted in plaintiff flying regularly with senior pilots instead of with Bair and Moon. John Thomas likewise agreed with this approach and, due to the fact that Becker went on leave, he was the one who actually made the decision to transfer plaintiff and to delay his jet training. Thomas testified that he, like Becker, was not sure if there really was a problem with plaintiff's performance, but because safety had to be his primary consideration he believed further evaluation was necessary. Plaintiff has cited no evidence that Thomas' explanation for this decision is pretextual or that the decision was in fact based on race. In light of the reports from other pilots raising safety concerns, Thomas' decision to conduct further evaluation was clearly sensible. Unlike most positions, the job of piloting passenger aircraft involves overriding issues of public safety. *Cf. Spurlock v. United Airlines, Inc.,* 475 F.2d 216, 219 (10th Cir.1972) (the risks involved in hiring unqualified pilots are "staggering."). Plaintiff argues the reports Thomas received were untrue, and asserts that this by itself raises a question of pretext. He points out that along with the negative reports, Thomas received positive reports indicating plaintiff had no unusual deficits, and argues that if Thomas was concerned "he had the ability to fly with plaintiff and conduct his own assessment of competency." As an initial matter, the record contains no suggestion that Thomas' role as Director of Flight Management included personally conducting pilot evaluations, and the fact that he delegated that task does not suggest pretext. Secondly, regardless of the fact that the negative reports came primarily from junior pilots with limited experience, those pilots were the ones with whom plaintiff flew most frequently, and their reports clearly raised safety issues that had to be evaluated by Raytheon. Third, given the

conflicting reports Thomas received, his method of determining the true state of affairs—i.e., evaluation of plaintiff by senior pilots in another department—was reasonable under the circumstances and does not give rise to an inference of pretext. Finally, plaintiff has cited no evidence that Raytheon treated Caucasian pilots about whom it had received similar safety complaints any differently than plaintiff. To the contrary, it is undisputed that in the past Raytheon had assigned Caucasian pilots to Production Flight Test to get a better feel for their abilities and to determine if they had deficits that needed to be corrected. Plaintiff accurately points out that other possible ways existed to handle the situation, but that is not the issue. Federal courts do "not sit as a super-personnel department that second-guesses [a] company's business decisions." *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1233 (10th Cir.2000).

■ A challenge alleging pretext "requires us to look at the facts as they appear to the person making the decision [affecting the] plaintiff." *Id.* at 1231. There is no dispute that Thomas received conflicting reports about plaintiff. Under the circumstances, Thomas testified that safety was an overriding concern that necessitated further evaluation of plaintiff's skills before he began flying jet aircraft. Even if the negative reports about plaintiff were actually false and his flying skills were "superb," as plaintiff testified, that alone would not raise an inference of pre-

text. The relevant question is whether Thomas genuinely believed in the reasons he cited for his decision.[9] *See Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir.1999) ("The relevant inquiry is not whether United's proffered reasons were wise, fair or correct, but whether United honestly believed those reasons and acted in good faith upon those beliefs."); *see also Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999) (plaintiff's own opinions about her qualifications do not give rise to a material fact dispute).

Plaintiff asserts that a question of pretext arises because Mahlone Becker "recognized the possibility one of these men providing adverse reports [John Bair] held beliefs about preferential treatment of African–Americans in the military ... [and] was bringing racial prejudice to the issue," Doc. 66 at 17, and "[w]hen she informed Mr. Thomas of these problems in her May 21, 1999 memorandum, he was put on notice to investigate such possible motives behind the reports, and he did not do so." *Id.* This assertion does not withstand scrutiny. To begin with, there is no evidence Mahlone Becker ever informed Thomas that Bair or anyone else ever expressed any prejudice against African–Americans. The comments to which plaintiff refers appear not in Becker's May 21 memo to John Thomas, but in Nita Long's undated notes of a KHRC interview of Becker at some point after plaintiff filed a KHRC complaint.[10] As the court noted previous-

**9.** Plaintiff cites *Fischbach v. D.C. Dept. of Corrections*, 86 F.3d 1180, 1183 (D.C.Cir. 1996) for the proposition that "[e]vidence indicating that an employer misjudged an employee's performance or qualification is, of course, relevant to the question whether its stated reason is a pretext masking prohibited discrimination." Doc. 66 at 10. Plaintiff omits the second half of the court's comment, however, which qualifies the foregoing statement by observing that an inference of pretext

arises "if the employer made an error too obvious to be unintentional ..." *Id.*

**10.** In his response, plaintiff attached these notes and, without citing any foundation, asserted that they came from an interview of John Bair. Doc. 66 at 5. In reply, Raytheon attached an affidavit of Nita Long stating that the notes reflected an interview of Mahlone Becker, not John Bair.

ly, those notes are unclear as to whom Becker (or Long) was referring, and the record contains no evidence to establish when or in what context the underlying comments were allegedly made. There is certainly no evidence that Thomas was informed of them. Furthermore, it is undisputed that Thomas received reports questioning plaintiff's skills from several pilots, not just from the individual who allegedly expressed negative views about African–Americans. Finally, Thomas' decision to temporarily transfer plaintiff was designed to do exactly what plaintiff argues should have been done: investigate to determine whether the complaints had any validity. The transfer would have accomplished this by having plaintiff fly with senior pilots in another department instead of flying with the individual who allegedly made the negative comments about African–American pilots. *Cf. Kendrick,* 220 F.3d at 1231 (discrimination claim may lie if manager acts as a "rubber stamp" for a subordinate's prejudice). Plaintiff may have felt he was being unfairly singled out for scrutiny, but given the fact that these complaints were made to management, Raytheon unquestionably had an obligation to determine if there was a safety issue, and the unfortunate effect of plaintiff's failure to report to Production Flight Test was that it prevented Raytheon from determining whether the complaints were valid.

Plaintiff's belief that he was denied jet flight training on the basis of race was understandable given that he saw Caucasian pilots hired after him receive jet training before him, while his own training was indefinitely postponed by Thomas. But Raytheon has cited race-neutral reasons for this, and plaintiff has not cited evidence casting legitimate doubt on the credibility of that explanation. Plaintiff has not shown he was similarly situated to these other pilots. There is no evidence that Becker or Thomas received safety complaints on these other individuals of the type they received concerning plaintiff. Plaintiff has cited no evidence to undermine Thomas' explanation that his decision was motivated by a genuine concern for safety. Moreover, these other pilots, unlike plaintiff, were already type-rated in jets at the time of their hire and had experience flying jets. *Cf. Fischbach v. D.C. Dept. of Corrections,* 86 F.3d 1180, 1183 (D.C.Cir.1996) ("Title VII liability cannot rest solely upon a judge's determination that an employer misjudged the relative qualifications of admittedly qualified candidates."); *Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Services,* 165 F.3d 1321, 1330 (10th Cir.1999) ("it is within the employer's discretion to choose among [qualified candidates] so long as the decision is not based on unlawful criteria."). Under the circumstances, the record discloses no genuine issue of fact as to whether Raytheon's decision was a pretext for discrimination.

### C. Discharge.

 Raytheon asserts that it discharged plaintiff because he refused to report to work from June 1st until August 30th, 1999, and because he engaged in threatening or intimidating behavior at Tallgrass Country Club on August 28, 1999. In response, plaintiff argues that he has demonstrated pretext because Raytheon's Rules of Conduct provide that the punishment for a first instance of insubordination is a suspension without pay, and because plaintiff has "rebutted head-on the vague claims of threatened violence at the Tallgrass Country Club, . . ." Doc. 66 at 20.

Plaintiff's arguments are unavailing. Although plaintiff makes a perfunctory attempt to show that he had health problems between June and August of 1999, he conceded in his deposition that he was mentally and physically capable of working dur-

ing this period, and he failed to provide any documentation to Raytheon to show that he could not work. The record makes clear enough that plaintiff was upset over his assignment and refused to report to Production Flight Test because he thought such an assignment was improper and unfair. Although plaintiff correctly points out that under Raytheon's rules a suspension is ordinarily prescribed for a first instance of insubordination, the rules also provide that greater punishment, including termination, may be imposed depending upon the severity of the violation.[11] Plaintiff cites no other example of a Raytheon employee refusing to report to work for such an extended period of time, and it is undisputed that Caucasian employees at Raytheon have been terminated in the past for refusing to accept an assignment. The evidence cited thus raises no genuine issue of pretext. As for the incident at Tallgrass Country Club, plaintiff likewise fails to cast legitimate doubt on Raytheon's assertion that it viewed his behavior as a violation of the company's rule against threatening or intimidating behavior. It may very well be that plaintiff had no intention of intimidating or threatening anyone at the August 28th meeting. But at that time, plaintiff had not been seen by his co-workers for almost three months, and had stopped coming to work and periodically left phone messages in the middle of the night saying he would not be in, when he showed up unannounced at the pilot's meeting and sat in a chair in the aisle. When the meeting ended, Gary Blessing said hello to plaintiff, but plaintiff did not respond. When John Bair said hello and asked how plaintiff was doing, plaintiff responded with apparent anger saying, "How do you think I'm doing?" Plaintiff then approached John Thomas, and when Thomas said "Hello Matt," plaintiff did not respond, but just looked at Thomas and then left the room. Regardless of what plaintiff intended to convey by his actions, under these circumstances the company could reasonably consider it to be threatening behavior that violated the company rule. Plaintiff has cited nothing to show that the company did not genuinely consider this incident to be a violation of its rules or to suggest that the company's decision was in fact a pretext for racial discrimination. *See Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) ("mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.").

## D. Retaliation.

■ Lastly, plaintiff contends the timing between the cancellation of his Beechjet training and his discrimination complaint to Art Wegner's office on or about June 4, 1999 permit an inference that the cancellation of the training was an act of retaliation for complaining of discrimination. This contention fails under the undisputed facts. The record shows that the postponement of plaintiff's jet training was planned before plaintiff complained to Wegner's office, as shown by Mahlone Becker's May 21, 1999 memo to John Thomas, in which she indicated her intent to delay the training until after plaintiff's stint in Production Flight Test. Thomas informed plaintiff of the transfer on June 1, 1999, prior to plaintiff's complaint, and told him the assignment would not afford him the opportunity to fly jets. Although plaintiff testified he could not remember whether Thomas told him at the June 1 meeting that his Beechjet training session for June had been canceled, the record suggests it was the postponement of the

---

11. The Raytheon rules also provided that "absence for three consecutive working days without proper notification" would result in termination on the first violation.

training, at least in part, that prompted plaintiff's complaint to Art Wegner. At any rate, the evidence does not support an inference that cancellation of the jet training was in retaliation for plaintiff's call to Wegner's office after the June 1 meeting. Even if plaintiff could show that the actual cancellation occurred after that telephone call, plaintiff has not cited any evidence that the cancellation of the training resulted from anything other than Thomas' view that plaintiff's performance on propeller aircraft should be evaluated before he began training on jet aircraft.

## IV. Conclusion.

For the reasons set forth above, defendant Raytheon Aircraft Company's Motion for Summary Judgment (Doc. 57) is hereby GRANTED. The clerk is directed to enter a judgment of dismissal in favor of the defendant. IT IS SO ORDERED this 6th day of March, 2002, at Wichita, Ks.